PRIVILEGED AND CONFIDENTIAL
DRAFT ATTORNEY WORK PRODUCT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

| | |
|---|---|
| AMERICAN WATERWAYS OPERATORS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 18-12070-DJC |
| v. | ) |
| | ) |
| UNITED STATES COAST GUARD, | ) |
| | ) |
| Defendant. | ) |

---

**LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff American Waterways Operators ("AWO") hereby submits this Statement of

Material Facts in support of its Memorandum of Law and Motion for Summary Judgment. As set

forth below and in the accompanying Exhibits and Administrative Record, there is no genuine

dispute as to any material fact stated herein, and AWO is entitled to summary judgment on the

Administrative Record ("AR" or "Record"). Fed. R. Civ. P. 56(a); *In re Smith & Wesson*

*Holding Corp.*, 669 F.3d 68, 73 (1st Cir. 2012). An issue is "genuine" if a reasonable jury could

return a verdict for the non-moving party, *Anderson v. Liberty,* 477 U.S. 242, 248 (1986). A fact

is "material" when it has the "potential to affect the outcome of the suit under applicable law."

*Nereida-Gonzalez v. Tirado-Delgado,* 990 F.2d 701, 703 (1st Cir. 1993).

**I.  STATEMENT OF MATERIAL FACTS OF RECORD**

The following are the pertinent material facts of record as to which there is no genuine

issue to be tried:

1. Plaintiff, AWO, is the national trade association of the U.S. tugboat, towboat, and barge

   industry. Members of AWO include owners or operators of tugboats and tank vessels that

   operate in the waters of Massachusetts and are, therefore, subject to the Massachusetts laws

at the center of this and the related cases. AWO members are also subject to federal marine safety and environmental protection regulations promulgated and administered by the Coast Guard.

2.  AWO's mission is to promote the long term economic soundness of the tugboat, towboat, and barge industry, and to enhance the industry's ability to provide safe, efficient, and environmentally responsible transportation, through advocacy, public information, and the establishment of industry safety standards. AWO acts as a principal advocate for the industry in Washington, DC before federal policymakers and federal officials. Case No. 05-10112-JLT, Dkt. No. 6, Ex. 1, Decl. of Thomas Allegretti, at 1-2 (Feb. 23, 2005).

3.  Defendant in this action is the United States Coast Guard ("Coast Guard" or "Agency").

4.  Defendant Coast Guard is a military and maritime service within the United States Department of Homeland Security, an executive department of the United States, is one of the five armed forces of the United States, and is an agency of the United States. 14 U.S.C. § 1; *see* Homeland Security Act of 2002, Pub. L. No. 107-296 § 101, 116 Stat. 2135, 2142 (2002).

5.  In August 2004, the Governor of the Commonwealth of Massachusetts signed into law "An Act Relative to Oil Spill Prevention and Response in Buzzards Bay and Other Harbors and Bays of the Commonwealth," 2004 Mass. Acts ch. 251, amended by 2004 Mass. Acts ch. 457 § 1 ("MOSPA").

6.  MOSPA purported to regulate tugboat and tank vessel operations in Massachusetts state

waters. In particular, MOSPA:

    A.  Required coastwise vessels carrying oil, hazardous material, or other hazardous waste

to "take on and employ" a Massachusetts-licensed pilot when traveling through

certain Massachusetts waters;

    B.  Established navigation watch requirements for all towed vessels transiting Buzzards

Bay and carrying 6,000 or more barrels of oil, manning requirements on any vessel

that is towing a tank barge carrying 6,000 or more barrels of oil in Buzzards Bay, and

crew requirements for tank barges;

    C.  Prohibited vessels not in compliance with federal design standards for double hulls

from docking, loading, or unloading in Massachusetts;

    D.  Set forth mandatory drug and alcohol testing policies and procedures;

    E.  Required all tank barges carrying 6,000 or more barrels of oil to have a tugboat escort

when traveling in Massachusetts waters deemed "areas of special interest;"

    F.  Mandated that tank vessels follow certain vessel routes through Massachusetts

waters; and

    G.  Required all tank vessels traveling in Massachusetts waters to present a certificate of

financial assurance to the Massachusetts Department of Environmental Protection of

at least one billion dollars, which amount could be lowered based on certain

enumerated criteria. *Id.*

7.  In 2008, the Commonwealth enacted additional requirements for tank vessel operations. "An

Act Further Protecting Buzzards Bay," 2008 Mass. Acts. Ch. 268 (amending Mass. Gen.

Laws ch. 21L, § 4, ch. 21M, §§ 1, 8, and adding ch. 21M, § 9).

8.  The 2008 Act imposed a scheme of notification, pilotage, and tug escort rules. All tank

    vessels carrying 6,000 or more barrels of oil in Buzzards Bay were:

    A.  required to have a tug escort, if not already accompanied, and

    B.  subject to "triple the fines" that normally apply in the event of an oil spill if a vessel

        had (a) "failed to provide [24-hour] notice" to the state prior to operating in Buzzards

        Bay; or had (b) "failed to request a state pilot" to board prior to entering Buzzards

        Bay. 2008 Mass. Acts. Ch. 268.

9.  The 2008 Act was amended in September of 2009 ("2009 Amendments") by the General

    Court of Massachusetts to make both stylistic changes and substantive revisions to the Act.

    "An Act Preventing Oil Spills in Buzzards Bay," 2009 Mass. Acts ch. 101 (amending Mass.

    Gen. Laws ch. 21L, §§ 1 and 4, ch. 21M, §§ 1 and 9) (forming the "2009 Act").

## PRIOR LITIGATION OVER MOSPA

10. On January 18, 2005, the United States filed suit against the Commonwealth in this Court,

    seeking to declare invalid and to enjoin permanently enforcement of MOSPA. *United States

    v. Massachusetts*, Civ. A. No. 1:05-cv-10112-DPW (D. Mass.), Dkt. No. 1, Complaint (Jan.

    18, 2005).

11. The United States alleged, among other things, that certain provisions of MOSPA unlawfully

    assert Commonwealth authority over objects and subject matters of marine safety and

    environmental protection committed to the sole authority of the United States, and that such

    assertions of state level authority are expressly forbidden by federal law, conflict with federal

    law, or otherwise impede the accomplishment and execution of the full purposes and

    objectives of federal law. *Id*. at ¶¶ 33-37.

12. AWO is one of three intervenor-plaintiffs in the 2005 *United States v. Massachusetts* litigation. *Id.* at Dkt. No. 6, Motion to Intervene by AWO, et al. (Mar. 8, 2005).

13. On July 24, 2006, the District Court granted the United States' and the intervenor-plaintiffs' motions for judgment on the pleadings, finding that the seven challenged provisions of MOSPA "are preempted, invalid, and unconstitutional under the Supremacy Clause of the United States Constitution[,]" and "permanently enjoined" the Commonwealth from enforcing the challenged provisions of the Act. *United States v. Massachusetts*, 440 F. Supp. 2d 24 (D. Mass. 2006).

14. Among other things, the District Court held that sections of MOSPA were preempted by federal law and unconstitutional under the Supremacy Clause of the United States Constitution. *Id.* at 35, 48.

15. The Commonwealth appealed the District Court's invalidation of three of MOSPA's seven challenged provisions. *United States v. Massachusetts*, 493 F.3d 1 (1st Cir. 2007).

16. On appeal, the First Circuit concluded that further development of the record should be undertaken on whether the Coast Guard had adequately expressed preemptive intent in promulgating the federal regulations alleged by the United States and plaintiff-intervenors to supersede or displace state regulation. *Id.* at 13.

17. The 2007 First Circuit decision vacated the District Court's order as to the three provisions at issue in the Commonwealth's appeal and remanded the issues to the District Court for further record development and argument. *Id.* at 4, 25.

18. On remand, the District Court once again considered the constitutionality of MOSPA's manning regulations for tank vessels and tugboat escort requirements. During the pendency of the First Circuit's appellate review, the Coast Guard had modified the controlling federal

First District Regulated Navigation Area ("RNA") regulations, amending them in various

aspects and adding more definitive statements of preemptive intent. *See* Final Rule:

Regulated Navigation Area; Buzzards Bay, MA; Navigable Waterways Within the First

Coast Guard District, 72 Fed. Reg. 50,052 (Aug. 30, 2007) ("2007 RNA").

19. The 2007 RNA expressly stated that it preempted the remaining MOSPA provisions at issue

and established revised tug escort and manning provisions with respect to Buzzards Bay. 72

Fed. Reg. 50,056-057 (Aug. 30, 2007).

20. On March 31, 2010, the District Court again entered judgment in favor of the United States

and plaintiff-intervenors, permanently enjoining (once again) MOSPA's manning regulations

for tank vessels and tugboat escort requirements. *United States v. Massachusetts*, 724 F.

Supp. 2d 170 (D. Mass. 2010) (adopting the report and recommendation of Magistrate Judge

Sorokin).

21. The District Court found that the Coast Guard's 2007 RNA expressly preempted the MOSPA

provisions at issue, and that the MOSPA provisions were conflict-preempted because they

"stand as an obstacle to the accomplishment and execution of the full purposes and objectives

of Congress." *Id*. at 183-85.

22. The Commonwealth and supporting intervenors appealed the District Court's second

decision invalidating MOSPA to the First Circuit. Civ. A. No. 1:05-cv-10112-DPW (D.

Mass.), Dkt. No. 172, Notice of Appeal (May 27, 2010).

23. On appeal, the First Circuit did not address the constitutional issues that were before the

District Court. "We take no view of the overarching preemption issue, the applicability *vel*

*non* of any other extraordinary circumstances exception, the APA issue, or any of the parties'

other contentions." *See United States v. Coal. for Buzzards Bay*, 644 F.3d 26, 39 (1st. Cir.

2011).

24. The First Circuit instead focused on the issue of the Agency's compliance with the National

Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4231-4347.

25. The Court of Appeals stated:

> What we have said to this point dictates what must be done. The error here was
> one of function, not merely of form. The administrative record does not show that
> the Coast Guard ever analyzed, or even adequately studied, the environmental
> impact of its proposed action. . . . We need go no further. Where, as here, an
> agency has failed to satisfy its obligations under NEPA . . ., the appropriate
> remedy is to remand to the agency for performance of those obligations.

*Id*. at 38-39.

26. The First Circuit ordered vacatur of the District Court's injunction and remanded the matter

to the Agency for the performance of a NEPA analysis. *See id.*

27. Following the entry of the First Circuit's decision, on August 18, 2011, the parties in *United

States v. Massachusetts* filed a Joint Status Report with the District Court requesting that the

District Court stay and administratively close the case pending the Agency's remand

activities. Civ. A. No. 1:05-cv-10112-DPW (D. Mass.), Dkt. No. 186, Status Report (Aug.

18, 2011).

28. In that report to the District Court, the Coast Guard indicated that it already had initiated

action to contract for the required NEPA assessment and analysis. *Id.* at 2.

29. Because the fact patterns and legal arguments in the later-filed *AWO v. Patrick* substantially

overlapped with the issues raised in *United States v. Massachusetts*, the parties in *AWO v.

Patrick* similarly proposed to the District Court that *AWO v. Patrick* be stayed and

administratively closed during the duration of the remand in *United States v. Massachusetts*.

*AWO v. Patrick*, Civ. A. No. 1:10-cv-10584-DPW (D. Mass), Dkt. No. 50, Order of Stay and Administrative Closing (Aug. 19, 2011).

30. On August 19, 2011, the District Court entered its order remanding the matter to the Coast Guard for further proceedings. *United States v. Massachusetts*, Civ. A. No. 1:05-cv-10112-DPW (D. Mass.), Dkt. No. 187, Order of Remand, Stay and Administrative Closing (Aug. 19, 2011). The First Circuit issued the order to remand because the Coast Guard "failed to satisfy its obligations under the NEPA and its error is not demonstrably harmless." *Coal. for Buzzards Bay*, 644 F.3d at 39.

31. The District Court entered a similar order in *AWO v. Patrick*, Civ. A. No. 1:10-cv-10584-DPW (D. Mass.), Dkt. No. 50, Order of Stay & Admin. Closing (Aug. 19, 2011). The District Court administratively closed the cases without prejudice to a party moving to restore the case(s) to the active docket. *Id.*

## COAST GUARD ACTIONS SINCE 2011 REMAND

32. Approximately a year after the Court of Appeals' remand order, in August 2012, the Coast Guard released a Notice of a draft Environmental Assessment ("Draft EA") that described the "reasonably foreseeable environmental impacts and socioeconomic impacts" for implementing an RNA in Buzzard's Bay. AR at 0005-0100.

33. The Agency received approximately 32 comments in response by the September 4, 2012 comment deadline. AR at 0235-1008.

34. The Draft EA concluded that "all of the action alternatives would reduce the probability of an accident occurring in Buzzards Bay that could result in the release of oil." AR at 0017. It found, however, that "Alternative 3a, the 2007 Final Rule, would cause the least adverse environmental impact while providing substantial risk reduction." *Id*.

35. Alternative 3a, the option favored by the Coast Guard, required (1) a federally licensed pilot, not a member of the crew, on each vessel towing a single hull tank barge transporting 5,000 or more barrels of oil or hazardous material through Buzzards Bay and the Cape Cod Canal; (2) a tugboat escort for all single hull tank barges transporting 5,000 or more barrels of oil or hazardous material through Buzzards Bay and the Cape Cod Canal; and (3) a Vessel Movement Reporting System, which provides a system for a ship to communicate its voyage plans and allows monitoring of the ship's compliance with those plans. AR at 0031; for description of Vessel Movement Reporting System, *see* AR at 1769.

36. Alternative 3a was the same as the 2007 Final Rule — it did not incorporate the protections provided for in Section 4 (enhanced personnel requirements for single hull barges and their towing vessels transporting 6,000 or more barrels of oil through Buzzards Bay and the Cape Cod Canal) and Section 6 (tugboat escort for both single and double hull barges transporting 6,000 or more barrels of oil through Buzzards Bay and the Cape Cod Canal) of MOSPA. AR at 0031.

37. In addition to the Notice of the Draft EA, the Coast Guard and the Massachusetts Department of Environmental Protection contracted for a "Buzzards Bay Risk Assessment." AR at 1009-1221. That study was released on November 20, 2012 and revised on January 22, 2013. AR at 1009.

38. The Risk Analysis discusses the potential environmental and socioeconomic impacts of five proposed alternatives and details the deleterious effects of oil spills in Buzzards Bay. *See* AR at 1020-21, 1033, 1076-1096. The Risk Assessment was peer-reviewed by members of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. AR at 1126-27.

39. The analysis concluded that the most important mitigation efforts to reduce the likelihood of an oil spill were (1) the requirement for an independent pilot, (2) the requirement for double-hull barges, (3) the availability of escort tugs, and (4) the operation of a Vessel Movement Reporting System or a Vessel Traffic Management System. *See* AR at 1020-21.

40. The Risk Assessment stated that, "Buzzards Bay is an RNA with federal regulations issued by the USCG establishing recommended routes to be taken through Buzzards Bay, requiring participation in a VMRS, and requiring single-hull tank barges carrying 5,000 barrels or more of oil or other hazardous materials to be accompanied by an escort tug and to be under the direction of a federally-licensed first class pilot who is not a member of the crew." AR at 1041.

41. In addition to the NEPA analysis, the Agency also held a "Conditional Escort Tug Workgroup Meeting" related to the RNA rulemaking on August 14, 2013. AR at 1730-35. At that meeting, Edward LeBlanc, from the Coast Guard's Southeastern New England Sector, stated "USCG feels that requiring tug escorts for all double-hulled barges may be unnecessary because of other protection measures in place, including federal pilots." AR at 1731. Richard Packard from Massachusetts' Department of Environmental Protection, stated that "industry has nevertheless complied with the state rule." *Id.* Participants stated that "additional layers of complexity raise the difficulty of monitoring and enforcement." AR at 1732. There was no AWO representative present at this meeting. *See* AR at 1735.

42. On February 3, 2014, the Coast Guard's responsible official, Commander Daniel B. Abel, signed a Finding of No Significant Impact ("FONSI"), which indicated that the 2007 Rule "would produce the greatest reduction in the risk of a release of hazardous cargo to Buzzards Bay." AR at 0102-03.

43. The Agency prepared a Final EA, dated December 2013, and published public notice of the

    Finding of No Significant Impact based on the Final EA on February 26, 2014. AR at 0232-

    34, 79 Fed. Reg. 10,818; *see* AR at 0101-0231.

44. In the final EA, the Coast Guard noted that its current non-mandatory, suggested routes are

    used by "most if not all tank barges … voluntarily." AR at 0149. "By not mandating their

    use, the U.S. Coast Guard affords commercial vessel masters the freedom to abandon the

    recommended routes if necessary to avoid the risk of collision or grounding." *Id.* Using a

    mandated route "would not have a beneficial impact due to the potential to put mariners at

    higher risk by requiring them to follow a set route when conditions warrant an alternative

    approach." AR at 0167. Mandating routes may have "minor beneficial impact … as long as

    mariners are permitted to abandon the route to avoid navigational hazards." AR at 0168.

45. "An incident in Buzzards Bay or the Cape Cod Canal that included the release of oil or a

    hazardous substance could affect both public health and safety." AR at 0175-76. "Specific

    human health reactions [to a hazardous material spill] are dependent on the material that is

    released and the extent and type of contact." AR at 0176. For example, a fuel oil spill may

    cause headaches, nausea, vomiting, and skin irritations. *Id.*

46. "While there are slight differences among the alternatives regarding the potential risk for a

    future incident, implementation of any of the alternatives would have an indirect, beneficial

    impact on public health and safety since they would all in some manner further reduce the

    potential for oil or hazardous material releases." AR at 0176.

47. On August 5, 2014, intervenor-plaintiffs in *United States v. Massachusetts*, including AWO,

    moved this Court to restore *United States v. Massachusetts* to the active docket and proceed

    to a disposition on the merits. Civ. A. No. 05-10112-DPW, Dkt. No. 190, Motion to Restore

Administratively Closed Case (Aug. 5, 2014). The plaintiffs in *AWO v. Patrick*, including

AWO, filed a similar motion in that case. Civ. A. No. 10-10584-DPW, Dkt. No. 53, Motion

to Restore Administratively Closed Case (Aug. 5, 2014).

48. Intervenor-plaintiffs moved to reopen and restore to active status in reliance on the United

States' representation that the Coast Guard's issuance of the FONSI represented the

Agency's completion of activities necessary to satisfy the requirements of the First Circuit's

remand. *Id.* at ¶¶ 11-13.

49. On August 6, 2014, the United States moved to reopen *United States v. Massachusetts*,

stating that the Coast Guard's issuance of the FONSI, represented the Agency's completion

of the First Circuit's directive to study the environmental impact of regulatory preemption of

certain provisions of Massachusetts law purporting to govern oil tanker traffic in Buzzards

Bay. Civ. A. No. 05-10112-DPW, Dkt. No. 191, Motion to Restore Case to the Active

Docket (Aug. 6, 2014).

50. The Commonwealth opposed the motions. On January 15, 2015, this Court held a hearing on

the motions. *United States v. Massachusetts*, Civ. A. No. 05-10112-DPW at Dkt No. 200-01,

Motion Hearing (Jan. 15, 2015).

51. At the hearing, the United States represented to the District Court that the Coast Guard had

completed its activities on remand. "Your Honor, our view is, certainly, that this matter is

ripe for further adjudication now …" *Id.* at Dkt. No. 201, Transcript of Motion Hearing at

4:15-16. When pressed by Judge Woodlock, however, the Agency agreed to clarify its

position as to whether further proceedings on remand were necessary for *United States v.*

*Massachusetts* to be resolved on the merits. *Id.* at Dkt. No. 201, Transcript of Motion

Hearing at 4:6-16, 6:9-7:14, 13:22-25 ("the United States is free to … do whatever it feels like doing, but there are consequences.").

52. At the hearing, Judge Woodlock stated "I think I have made clear to the plaintiff here what the potential consequences are … after 10 years of trying, if the United States has not gotten it right now, that the case should continue but should be rendered as a final judgment." Motion Hearing Tr. 13:25, 16:1-9. He also stated that the parties appeared not to understand "the practical reality of what this litigation would mean and what the resurrection of this litigation at this time would mean . . . If the Government is prepared to say it has done everything that is consistent with the opinion of the First Circuit, then I suppose it can come back. I would think long and hard about it, if I were in the position of the United States." *Id.* at 18:7-18. Following this exchange, the Coast Guard attorney, Steven Bressler, requested additional time to consider its answer. *Id.* at 19:21-21:11.

53. Three weeks later, on February 5, 2015, the Coast Guard received a letter from several Massachusetts Members of Congress, namely Senators Elizabeth Warren and Edward Markey and Representative William Keating. AR at 2055-56.

54. The Congressional letter states, "We were disappointed to learn that the U.S. Coast Guard is preparing to challenge a Commonwealth of Massachusetts law that aims to prevent oil spills in Massachusetts waters. . . . We urge the Coast Guard not to take legal action against the Commonwealth, but instead to continue to take steps to revisit its rulemaking proceeding on this matter." *Id.* "After more than a decade of litigation … it is time for the federal government to focus its limited resources on matters that will protect Buzzards Bay instead of what promises to be further resource-intensive litigation. . . . We strongly urge the Coast

Guard to abandon its efforts to reopen litigation and to focus instead on advancing the rulemaking it has already initiated." *Id.*

55. On February 5, 2015, the United States withdrew its motion to reopen *United States v. Massachusetts* to the Court's active docket. The Coast Guard stated that it withdrew the motion to reopen to determine whether further regulatory action was required to comply with the First Circuit's remand. Civ. A. No. 05-10112-DPW, Dkt No. 203, Notice of Withdrawal of the Motion to Reopen (Feb. 5, 2015).

56. The next day, on February 6, 2015, Massachusetts State Representative, Timothy Madden, sent another letter to the Coast Guard acknowledging the Agency's withdrawal of its request to reopen the litigation and stating, "I would like to express my appreciation for the Coast Guard's decision to withdraw the motion and would hope that the Coast Guard works with Massachusetts state officials if it decides to move forward with new rulemaking on this issue." AR at 2057.

57. Twelve days later, intervenor-plaintiffs also withdrew their motion, pending further action on remand by the Coast Guard. Civ. A. No. 05-10112-DPW, Dkt No. 205, Notice of Withdrawal of Motion to Restore (Feb. 17, 2005).

58. The Administrative Record filed in the present case shows no activity in 2015 by the Coast Guard to address the remand orders. *See* Civ. A. 1:18-cv-12070-DJC, Dkt. No. 25, Att. 1, Administrative Record Index.

59. The Administrative Record for the year 2016 reflects activity that is confined to an email description of a meeting between Rear Adm. Steven Poulin, the Commander of the First Coast Guard District, with representatives of Plaintiff, stating, in part, "I told them [i.e., AWO] I had no intent to look back at the 2007 RNA; from my perspective that litigation was

closed … it was our assessment along with DOJ that the district court on remand was generally displeased with the notion of reopening the case based on that EA." AR at 2060. "I told them that I wanted to look forward, assess what our preemption rulemaking might look like and how it may inform how we proceed, and … I wanted to take stock of the area and requirements before I decided on any new RNA for Buzzards Bay … I also mentioned that the RNA and federal preemption issues are politically sensitive so we need to be very deliberate and thoughtful in how we move forward, especially with a new Administration taking over in a few months." *Id.*; AR at 2060.

60. On March 23, 2017, Coast Guard attorney Brian Judge summarized a meeting with Plaintiffs' counsel Jonathan Benner stating, "the First District had tried to negotiate with [Massachusetts] in the 2012/2013/2014 time frame to get a mutually acceptable regulatory regime, but it was difficult because MA is happy with the status quo … Jon[athan Benner] did raise the question of whether the Coast Guard could bring more resources to bear on this; I just said I have no control over that … [DOJ Attorney] Ken Sealls told Jon that we would get back to him, but we could not give a specific time frame … Ken does not see any reason to change our position with regard to the litigation." *Id.*

61. In June 2017, more than twenty-eight months after withdrawing its motion to reopen, the Coast Guard informed AWO that the Agency was not preparing additional NEPA compliance measures in response to the remand order. AR at 2063.

62. Later in June 2017, the Coast Guard indicated to AWO that it was considering various courses of action, some of which would affect Buzzards Bay. AR at 2065.

63. In an email dated June 7, 2017, Rear Adm. Steven Andersen summarized a meeting with AWO Chief Operating Officer Jennifer Carpenter. *Id.*

64. In that email, Rear Adm. Andersen stated, "despite our continuing opinion that MOSPA

   violates preemption principles, the CG (w/DOJ advice) does not intend to reopen the current

   litigation because the record in that case is not strong. . . . [T]he CG is actively considering

   other options for Buzzard's [*sic*] Bay including when to initiate a new RNA, the

   environmental analysis that would accompany a new rulemaking, and the application of the

   administration's regulatory reform principles. . . . I posited that there is no quick solution to

   removing the application of MOSPA." *Id.*

65. On July 26, 2017, Coast Guard attorney Brian Judge wrote an email summarizing a meeting

   with personnel from AWO. "I further stated that the Coast Guard was considering the best

   path forward with regard to MOSPA and the Buzzards Bay RNA, but … no decision had

   been made yet. Jennifer Carpenter said the last time that she had spoken with you [Rear

   Adm. Steven Andersen], you told her the decision would be made sometime this summer …"

   AR at 2067.

66. On September 11, 2017, Coast Guard Admiral Charles Michel wrote an email to AWO

   President & Chief Operating Officer, Tom Allegretti stating "we definitely want to move this

   process forward now and we definitely want to do it in full partnership with AWO …

   [W]hile neither a PAWSA [Port and Waterways Safety Assessment] nor a new RNA is

   required to reopen the existing litigation, we believe that it is in our collective best interests

   to conduct the PAWSA first … Although reasonable minds can differ on the best approach to

   achieve this outcome as it relates to MOSPA, we are fully aligned on the outcome – to enjoin

   the enforcement of state law provisions that are preempted by federal law." AR at 2076.

67. Approximately a month later, Mr. Allegretti responded, informing the Admiral about AWOs

   intention to bring the present litigation. "[D]espite the plan to undertake a [PAWSA] for

Buzzards Bay, the Coast Guard has not committed to a clear path to return to court to bring this long-running litigation [*i.e.*, *U.S. v. Massachusetts* and *AWO v. Patrick*] to a successful conclusion." AR at 2075.

68. Approximately two months after Mr. Allegretti's letter and almost three years after withdrawing its motion to reopen the litigation, on Dec. 7, 2017, the Agency published a news release stating it would conduct a Ports and Waterways Safety Assessment ("PAWSA") for Buzzards Bay. AR at 1736. The Coast Guard published the PAWSA Report for Buzzards Bay in February 2018. *See* AR at 1835-1905.

69. The PAWSA process is a stakeholder participation risk assessment device that relies on workshops and public fora to identify risk factors and potential mitigation measures for various waterways throughout the United States. *See* AR at 1736, 1754-1790.

70. On November 30, 2017, Rear Adm. Andersen wrote, in an internal email, "I tried to convince AWO that a new RNA is related to preemption and that it is more efficient for the CG to pursue potential RNA at this time, rather than pursue old litigation and wait to update RNA." AR at 2079.

71. An internal Coast Guard Whitepaper dated May 8, 2018 stated that "The litigation has been inactive since 2015." AR at 2040. The document concludes that "C[ourse] O[f] A[ction] #1 is the recommended plan for the short term" and that "COA #6 is the recommended path forward." *Id.* at 2041. Neither course of action is legible because of the Agency's redactions. *See id.*

72. In a letter following the PAWSA workshop, AWO Senior Manager Brian Vahey noted that, during the PAWSA workshop, petroleum shipping industry participants were "expressly prohibited … from even speaking during the workshop. . . . As such, there was no certainty

that observer feedback will be incorporated into the PAWSA's risk and mitigation

calculations or will in any way inform the recommendations that come out of the final

report." AR at 2042-43.

73. On December 20, 2018, Representative Bennie G. Thompson, Ranking Member of the

Committee on Homeland Security, sent a letter to the Coast Guard to "express my serious

concern that the Coast Guard has failed to take action directed by a federal court, and in so

doing, has allowed to stand unconstitutional states laws that undermine the safety, security

and efficiency of critical maritime commerce." AR at 2080. The letter continued, "It is the

Coast Guard's duty … to obey court orders for corrective action when it has not met those

administrative requirements." *Id.* This obligation, he stated, "is undercut by the fact that the

U.S. Coast Guard has for seven years failed to obey the law and the decision of the courts …

I request a response as soon as possible that outlines your specific plan for the Coast Guard

to comply with the Court's directive." *Id.* at 2081.

74. In response to that letter, on March 7, 2019, Lt. Commander Taylor Kellogg wrote, "Since

the Court of Appeals ruling, the Coast Guard and the Commonwealth of Massachusetts

jointly undertook a 2012 risk assessment study of Buzzards Bay. However, the

Commonwealth disagreed with the methodology and results of the study. The

Commonwealth did not implement its findings … The Coast Guard will use the PAWSA and

all other relevant information to determine the best interests of all waterway users." AR at

2082.

75. The Coast Guard's response letter did not contain a schedule or any definitive plan to

complete its compliance with the First Circuit's order. *See id.*

76. In the Joint Status Report in the present case, filed with this Court on February 8, 2019, the
Agency stated that the "Coast Guard is under no court order to complete a rulemaking or an
analysis under the National Environmental Policy Act ("NEPA") by a date certain . . . there
is no current controversy between the Coast Guard and Massachusetts. The Coast Guard
intends to complete a new rulemaking for Buzzards Bay . . . The Coast Guard, however, has
no legal obligation to complete that process by a date certain." Dkt. No. 19, Joint Statement
re Scheduling Conference, at 1-2.

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2019, I electronically filed the foregoing with the United States District Court for the District of Massachusetts using the Court's CM/ECF system. The parties in this case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

Respectfully Submitted,

/s/ Christine R. Couvillon
     On behalf of:
C. Jonathan Benner (*pro hac vice*)
THOMPSON COBURN LLP
1909 K Street, N.W., Suite 600
Washington, D.C. 20006
202-585-6900
jbenner@thompsoncoburn.com