UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN WATERWAYS OPERATORS, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES COAST GUARD, <br><br> Defendant. | No. 18-cv-12070-DJC |

### DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

### AND

### RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1, Defendant submits this Statement of Undisputed Material Facts in support of its Cross-Motion for Summary Judgment. Defendant's Response to Plaintiff's Local Rule 56.1 Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment (ECF No. 31-2) appears at page fourteen below. Excerpts from the Administrative Record ("AR") are attached as an exhibit to this Statement and Response.

### OIL SPILL PREVENTION IN BUZZARDS BAY

1. Buzzards Bay is a Congressionally-designated Estuary of National Significance and part of the Massachusetts-designated "Cape and Islands Sanctuary." AR at 105. Numerous fish and marine species, including commercial, recreational, and endangered species, reside in Buzzards Bay. *Id.* at 149–58.

2. Buzzards Bay also hosts substantial commercial vessel transit, as it connects to the eastern entrance of the Cape Cod Canal. AR at 126–28. For example, in 2010, there were

"approximately 7,000 commercial vessel transits," including 495 vessels "laden with 5,000 or more barrels of petroleum or other hazardous material." AR at 126.

3. "Since 1969 there have been five incidents of tank barge groundings with oil spills in Buzzards Bay that have had an adverse impact on people, property, the coast and maritime environment, and the local economy." *Id.*

4. In 2003, a tank barge grounding spilled approximately 98,000 gallons of fuel oil into Buzzards Bay, thereby causing the pollution of 93 miles of coastline, killing over 450 birds, and shutting down thousands of acres of shellfish beds, for as long as four years. *Id.*, at 126, 165, 174.

5. Following that spill, the Commonwealth of Massachusetts (the "Commonwealth" or "Massachusetts") enacted the Massachusetts Oil Spill Prevention Act ("MOSPA"). *See* 2004 Mass. Acts 920 (codified as amended primarily at Mass. Gen. Laws ch. 21, §§ 42, 50B–50E, ch. 21M, and ch.103). MOSPA included, *inter alia*, seven provisions that gave rise to litigation:

   a. tank vessel design requirements (Mass. Gen. Laws ch. 21M, § 7);

   b. alcohol and drug testing policies (Mass. Gen. Laws ch. 21M, § 3);

   c. state pilotage requirements (Mass. Gen. Laws ch. 103, §§ 21 & 28);

   d. mandatory vessel routes (Mass. Gen. Laws ch. 21M, § 5);

   e. financial assurance requirements (Mass. Gen. Laws ch. 21, § 50C);

   f. manning requirements for single-hulled vessels (Mass. Gen. Laws ch. 21M, § 4); and

   g. tugboat escort requirements (Mass. Gen. Laws ch. 21M, § 6).

6. MOSPA thus ventured into areas where Congress had granted the Coast Guard authority through the Ports and Waterways Safety Act of 1972, Pub. L. No. 92–340, 86 Stat. 424,

as amended by the Port and Tanker Safety Act of 1978, Pub. L. No. 95–474, 92 Stat. 1471 (collectively, the, "PWSA"). Title I of PWSA authorizes the Coast Guard to "control vessel traffic in areas subject to the jurisdiction of the United States that the Secretary determines to be hazardous, or under conditions of reduced visibility, adverse weather, vessel congestion, or other hazardous circumstances," including establishing "operating conditions" and "restricting [vessel] operation." 46 U.S.C. 70001(a)(4) (formerly 33 U.S.C. § 1223(a)(4)), Pub. L. 115–282, title IV, §401(a), Dec. 4, 2018, 132 Stat. 4253, 4254. And Title II of PWSA mandates that the Coast Guard "shall prescribe regulations for the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning" of tank vessels. 46 U.S.C. § 3703(a).

7. MOSPA also encroached on a Coast Guard regulation establishing, *inter alia*, tugboat escort requirements for single-hulled barges, unless being towed by a twin-screw propulsion primary towing vessel (with separate power for each screw). *See* 33 C.F.R. § 165.100(d)(1)(i), (ii) (effective January 29, 1999); Regulated Navigation Area: Navigable Waters Within the First Coast Guard District, 63 Fed. Reg. 71,764, 71,771 (Dec. 30, 1998).

**PRIOR LITIGATION**

**A.   Preemption Phase (2005 to 2008)**

8. The United States sued the Commonwealth in this district in 2005, seeking to enjoin the seven above-cited provisions of MOSPA, *see supra* ¶ 5, as preempted by federal law. Compl., D. 1, *United States v. Massachusetts*, No. 1:05-cv-10112 (D. Mass. Jan. 18, 2005) (hereinafter, "Prior Litigation"). American Waterways Operators ("AWO" or "Plaintiff") intervened as a plaintiff. Prior Litigation (Mot. for Leave to Intervene, D. 6, Mar. 8, 2005).

9. In 2006, Judge Tauro permanently enjoined the Commonwealth from enforcing the challenged provisions of MOSPA. *United States v. Massachusetts*, 440 F. Supp. 2d 24 (D. Mass. 2006), *rev'd in part*, 493 F.3d 1 (1st Cir. 2007).

10. The Commonwealth appealed the injunction as to only three of the seven enjoined provisions. *See United States v. Massachusetts*, 493 F.3d at 4. Because the Commonwealth did not appeal the injunctions against enforcement of MOSPA's tank vessel design requirements, alcohol and drug testing policies, state pilotage requirements, and mandatory vessel routes, the Commonwealth remains enjoined from enforcing those provisions.

11. The Commonwealth's appeal succeeded as to the remaining three MOSPA provisions (financial assurance requirements, manning requirements for single-hulled vessels, and tugboat escort requirements), resulting in a remand to this district for further proceedings on preemption. *See id.* at 11–25.

12. The First Circuit held that different types of preemption analysis apply depending on whether the state law falls within the province of Title I, Title II, or both Titles I and II of PWSA. Because "Title I authorizes the Coast Guard to issue regulations on subjects within that title" without so mandating, *id.* at 6, state laws within the province of Title I are subject to standard conflict preemption analysis, *id.* at 8. Conflict preemption asks "whether federal authority has been exercised through a regulation intended to displace state law." *Id.*

13. "Title II works differently; it *requires* the Coast Guard to issue federal regulations governing subjects covered by that title." *Id.* at 6. "Field preemption applies to state law on subjects which are within the province of Title II of the PWSA." *Id.* Under field preemption, "only the Federal Government may regulate the 'design, construction, alteration, repair,

maintenance, operation, equipping, personnel qualification, and manning of tanker vessels.'" *United States v. Locke*, 529 U.S. 89, 111 (2000) (quoting 46 U.S.C. § 3703(a)).

14. Finally, the First Circuit recognized that certain subjects, such as operating requirements, fall within both Titles I and II of PWSA. *United States v. Massachusetts*, 493 F.3d at 8–10. State laws on those subjects are governed by a multi-factor overlap analysis. *Id.* at 10.

15. As to the manning requirements for single-hulled vessels, the First Circuit found error in Judge Tauro's application of field preemption and remanded for overlap analysis. *Id.* at 11–14.

16. As to the tugboat escort requirements, the First Circuit applied conflict preemption and found that the Coast Guard's then-existing rulemaking notices had not been sufficiently considered on the question of intent. *Id.* at 15–19. The First Circuit thus remanded to determine "whether the Coast Guard sufficiently expressed a clear intent to preempt the state tug escort provisions." *Id.* at 19.

17. As to the financial assurance requirements, the First Circuit remanded for further development on how the state would utilize its discretion in granting exceptions to the financial assurance requirements. *Id.* at 20–25.

18. Shortly after the First Circuit's remand, the Coast Guard published a final rule that expressed its intent to preempt MOSPA's manning requirements for single-hulled vessels and tugboat escort provisions. Regulated Navigation Area; Buzzards Bay; Navigable Waterways within the First Coast Guard District, 72 Fed. Reg. 50,052, 50,057 (Aug. 30, 2007).

19. On remand to this district, the case was reassigned from Judge Tauro to Judge Lindsey pursuant to Local Rule 40.1(k). <u>Prior Litigation</u> (Order, D. 88, June 25, 2007).

20.     After the United States moved for a preliminary injunction against enforcement of MOSPA's manning requirements for single-hulled vessels and tugboat escort requirements, Judge Lindsay referred that motion to then-Magistrate Judge Sorokin, who recommended that the challenged MOSPA provisions be enjoined based on the 2007 rule because "the Coast Guard's statement of preemption clearly and unequivocally states the Coast Guard's intent that its revised regulations preempt the two MOSPA provisions at issue here.." Prior Litigation (Report and Recommendation, D. 116, at 14, June 6, 2008).  The Report and Recommendation acknowledges that the parties had resolved their differences regarding the financial assurance requirements.  *Id.* at 2.

21.     In August 2008, Judge Young (who assumed authority over this case during Judge Lindsey's prolonged illness before his death) adopted Magistrate Judge Sorokin's Report and Recommendation, preliminarily enjoining enforcement of the challenged MOSPA provisions.  Prior Litigation (Electronic Order, Aug. 27, 2008); Prior Litigation (Order Granting Pl.'s Mot. for Prelim. Inj., D. 130, Sept. 23, 2008).

### B.     NEPA Phase (2008 to 2014)

22.     After publication of the Coast Guard's 2007 rule, the Commonwealth amended its counterclaims to allege, *inter alia*, that the Coast Guard's express preemption statement was invalid for violating the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, as the Coast Guard did not prepare an Environmental Analysis ("EA") or an Environmental Impact Statement ("EIS").  Prior Litigation (3d Am. Answer and Countercl., D. 105, Jan. 30, 2008).  The Commonwealth sought both a declaratory judgment and an order vacating the procedurally invalid aspects of the final rule.  *Id.*

23.     Both the United States and the Commonwealth moved for summary judgment. Then-Magistrate Judge Sorokin recommended denying the Commonwealth's motion and

granting the United States' motion on the grounds that any NEPA violation was harmless, as the United States had already performed much of the required environmental analysis. Prior Litigation (Report and Recommendation on Mots. for Summ. J., D. 154, July 29, 2009).

24. The case was reassigned to Judge Woodlock in August 2009. Prior Litigation (Electronic Notice of Reassignment, Aug. 11, 2009). Judge Woodlock adopted both of then-Magistrate Judge Sorokin's Reports and Recommendations, and concluded that the Coast Guard's NEPA violation was "essentially harmless" because "the substance of the Coast Guard's actual rulemaking analysis was the functional equivalent of what an environmental impact statement would have generated." *United States v. Massachusetts*, 724 F. Supp. 2d 170, 174–175 (D. Mass. 2010), *rev'd sub nom United States v. Coal. for Buzzards Bay*, 644 F.3d 26 (1st Cir. 2011). Judge Woodlock entered permanent injunctions against the two remaining MOSPA provisions (manning requirements for single-hulled vessels and tugboat escort requirements). *Id.* at 175.

25. The Commonwealth and Intervenor-Defendant Coalition for Buzzards-Bay appealed to the First Circuit. On appeal, the First Circuit reversed Judge Woodluck's harmless error determination and vacated the injunction against enforcement of the two remaining MOSPA provisions. *Coal. for Buzzards Bay*, 644 F.3d at 37–39. The First Circuit further "return[ed] the case to the district court with instructions to remand it to the Coast Guard for further proceedings consistent with this opinion." *Id.* at 39.

26. Judge Woodlock then remanded the matter to the Coast Guard and administratively closed the case "without prejudice to the right of any party to restore it to the active docket upon termination of the remand proceedings by filing an appropriate motion." Prior Litigation (Order of Remand, Stay and Administrative Closing, D. 187, Aug. 19, 2011).

By the time of that order, the Coast Guard had already initiated action to contract for the required NEPA assessment. Prior Litigation (Joint Status Report, D. 186, Aug. 18, 2011).

27.     Pursuant to the remand, the Coast Guard completed a Final EA in December 2013 and prepared a Finding of No Significant Impact ("FONSI"), which was published in February 2014. *See* 79 Fed. Reg. 10,818 (February 26, 2014); AR at 3–4. That EA was limited to information existing in 2007. AR at 106 ("However, our task, as directed by the Court, was to correct the deficiency in the NEPA process for the 2007 RNA in order to complete the 2007 rulemaking. To complete that task required consideration of the world as it was in 2007, not as it is today."). The Coast Guard explained that the "Final EA is intended to remedy" the NEPA flaw that the First Circuit found in the 2007 Final Rule. 79 Fed. Reg. at 10,819.

28.     In August 2014, the United States moved to restore the case to the active docket "so the parties may proceed to final judgment." Prior Litigation (Mot. to Restore Case to the Active Docket and Mem. in Supp. Thereof, D. 191, Aug. 6, 2014).

29.     Intervenor-Plaintiff AWO also moved to restore the case to the active docket. Prior Litigation (Intervenor-Plaintiffs' Motion to Restore Administratively Closed Case to the Active Docket and to Proceed to Disposition on the Merits, D. 190, Aug. 5, 2014). At that time, AWO told Judge Woodlock that the "conditions imposed by the First Circuit's remand have been satisfied," because the "Coast Guard complied fully with NEPA's requirements and issued a finding of no significant impact on February 26, 2014." *Id.* at 3, 7.

30.     The Commonwealth objected to the restoration motions on two grounds. First, the First Circuit had, according to the Commonwealth, "vacated" the Coast Guard's 2007 rule. Prior Litigation (Mem. of the Commonwealth in Opp'n to the United States' and Industry-Intervenors' Mots. to Restore Case to the Active Docket, D. 195, at 2, 5, Aug. 22, 2014) (citing

8

*Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 758 (D.C. Cir. 1987)); *see also* Prior Litigation (Mot. Hr'g. Tr., D. 201, 16:11–17:19, Jan. 27, 2015) ("They are trying to potentially proceed on the 2007 rule, which was invalidated by the First Circuit, without promulgating a new rule.") (citing *Bowen*).

31.     Second, the litigation was unripe for judicial review, in the Commonwealth's view, because the Coast Guard had begun a new "cooperative effort to discuss and work jointly toward a solution" with the Commonwealth, with the intent of "rulemaking initiated by the Coast Guard that would establish a new regulatory framework for the transportation of oil by tank barges through Buzzards Bay." Prior Litigation (Mem. of the Commonwealth in Opp'n to the United States' and Industry-Intervenors' Mots. to Restore Case to the Active Docket, D. 195, at 2, Aug. 22, 2014). Specifically, the Coast Guard published an Advanced Notice of Proposed Rulemaking ("ANPRM") stating, *inter alia*, "The Coast Guard believes that under certain conditions (e.g., adverse weather, equipment limitations), double hull tank barges laden with 5,000 or more barrels of oil or hazardous material may require a tug escort." 78 Fed. Reg. 40,651, 40,652 (July 8, 2013); AR at 1222–25. The Commonwealth thus urged Judge Woodlock not to upset the "status quo," in which "industry has in fact been operating in compliance with MOSPA's tug escort requirement for double-hulled tank barges since it was reinstated on July 11, 2011," until the Coast Guard publicly stated its intentions regarding the ANPRM. Prior Litigation (Mem. of the Commonwealth in Opp'n to the United States' and Industry-Intervenors' Mots. to Restore Case to the Active Docket, D. 195, at 7–8, Aug. 22, 2014).

32.     As the ANPRM noted, "Single-hull tank barges will continue to require tug escorts under all circumstances," until they are "phased out January 1, 2015." 78 Fed. Reg. 40,651, 40,652 (July 8, 2013); AR at 1222–25. Because single-hull tank vessels were legally

9

phased out on January 1, 2015, *see* 46 U.S.C. § 3703a, the dispute over MOSPA's manning requirements for single-hulled vessels became moot on that date.

### C.     Definitive Determination Phase (2015)

33.     The case entered a new phase following a January 15, 2015 hearing before Judge Woodlock.  *See* Prior Litigation (Mot. Hr'g. Tr., D. 201, Jan. 27, 2015).  At that hearing, only one MOSPA provision remained in dispute—tugboat escort requirements.

34.     Judge Woodlock began the hearing by expressing "a little bit of puzzlement," as he had "understood the direction from the First Circuit basically to be to the United States to go back to the drawing board," and come back to him only once the United States had reached its "end medical result."  *Id.* at 3:16–22.  Thus, he asked both sides whether there is "anything else that foreseeably the United States is going to be doing to address the issues that comprise this litigation."  *Id.* at 4:19–21.

35.     The parties disagreed about how the Coast Guard's 2013 ANPRM affected the litigation.  The Commonwealth claimed that, in publishing the ANPRM, the Coast Guard had "started a rulemaking process" that "they are required to pursue."  *Id.* at 5:19–23.  The United States disagreed that the ANPRM was "a pending rulemaking proceeding," and instead characterized it as "just a request for comments," *id.* at 6:22–7:4.

36.     Judge Woodlock then asked "why [he] should be spending time on this case when there is a question about where the United States is going to come to rest on it," *id.* at 7:15–22, as, in his view, the 2013 ANPRM "more than touches . . . on the fundamental issues raised in this case," *id.* at 6:15–21.  Concerned that the litigation had become a "moving target," Judge Woodlock recommended that "this particular set of issues is one that would benefit from a definitive determination by the Coast Guard of where it is and where it is going to be."  *Id.* at 9:10–21.

37. AWO argued that the matter was ripe for further review because the First Circuit "expressly disclaimed intent to reach other issues beyond the NEPA compliance," which had "been addressed . . . so that the remand order is complied with." *Id.* at 14:11–15:19.

38. Judge Woodlock was unpersuaded, stating: "You may read the opinions on the Court of Appeals in a fashion that you find affirming of the United States's position and approach. Someone less interested might not take that position, perhaps even a judge who ruled in your favor below." *Id.* at 15:20–25. Judge Woodlock explained that he was "not asking to have a legal intern look carefully at the language of the Court of Appeals decision to say, 'Look it, they just said, Just NEPA,'" but instead wanted an "adult" to account for "the overarching direction of opinions." *Id.* at 19:9–20.

39. In the end, Judge Woodlock repeatedly warned the United States of the consequences should it decide to reopen the litigation. *Id.* at 12:25–13:1 ("a resolution of the case will be with prejudice"), 16:1–4 ("I will conceive my role, if this comes back, to drive a stake in the heart of this litigation"), 18:4–6 ("Maybe that is not sufficiently terrifying to the United States as a litigant."), 19:16–20 ("a party that repeatedly returns without taking into account the overarching direction of opinions is going to find themselves subject to a much more nuanced scheduling process for their litigation"); 22:5–7 ("If the Government, the United States, wants to go forward, the fat will be in the fire. The fire will be hot.").

40. Several weeks after the hearing, the United States withdrew its motion to reopen the litigation "in light of this Court's remarks during the January 15, 2015 motions hearing." <u>Prior Litigation</u> (Notice of Withdrawal of Motion to Restore Case to the Active Docket and Response to the Court, D. 203, Feb. 5, 2015). Intervenor-plaintiffs (including AWO) then

withdrew their motion to reopen the case. Prior Litigation (Notice of Withdrawal of Motion to Restore Case to the Active Docket, D. 205, Feb. 5, 2015).

## POST-LITIGATION ACTIVITY

41. In 2016, the Coast Guard informed AWO of its view that "the litigation was closed," and it "had no intent to look back at the 2007 RNA." AR at 2060. Despite continued pressure from AWO to the Coast Guard's senior leadership to resurrect the litigation, the Coast Guard maintained its position against reopening the litigation and instead undertaking new rulemaking. *See* AR at 2061, 2065–66, 2067–69, 2075–78. As the Coast Guard further explained to AWO, this new rulemaking may take some time because "the new operational commander" in the First District "wanted to take stock of the area and requirements before [he] decided on any new RNA for Buzzards Bay," "especially with a new Administration taking over in a few months." AR at 2060.

42. In July 2017, the Coast Guard described the conditions for future rulemaking, as follows:

   a. "the current RNA . . . principally applied to single hull barges" which "no longer exist" (AR at 2001);

   b. "any federal actions to change the Buzzards Bay regulatory status quo" may face criticism from "industry stakeholders, including members of AWO" and "the two largest petrochemical transporters," who "support MOSPA requirements because they provide relatively inexpensive layers of additional protection supporting good community relations" (*id.* at 2003);

   c. it may be difficult to justify any "roll back" of protections because "[t]here have been no accidents" since MOSPA's enactment and "tug escort costs are minimal" (*id.*);

       d. given the existence of "additional navigation safety standards" for other locations, like "Prince William Sound, Puget Sound, and the Columbia River," the Buzzards Bay community may seek similar protections (*id.*); and

       e. "removing escort tug requirements would face extreme opposition because," *inter alia*, data since MOSPA's escort tug requirement went into effect following the First Circuit's 2011 decision "indicate[s] some reliance on escort tugs" at a rate of 8% may be "difficult to refute" (*id.*).

43. In late 2017, the Coast Guard initiated a Ports and Waterways Safety Assessment ("PAWSA") on Buzzards Bay. AR at 1736. The "PAWSA is a joint effort involving waterway users, stakeholders, and agencies that will identify ways to improve the safety of Buzzards Bay." *Id.* The PAWSA was "needed to assess the current navigational risk in Buzzards Bay" in order to update the "existing Regulated Navigation Area (RNA)," which had become "obsolete" due to the "advent of newer double hulled barges . . . and other advances in technology." AR at 2070; *see also* AR at 2001 ("the remaining elements of the current RNA apply exclusively to single hull barges, which no longer exist").

44. PAWSA participants convened in February 2018 "for a structured workshop aimed to ensure the environmental protection and safe navigation of the Buzzards Bay waterway system." AR at 1736. Those participants included members of the tug and barge industry, the commercial vessel industry, the commercial fishing industry, environmental organizations, law enforcement, local municipalities, and tribal groups. AR at 1757–1758.

45. The PAWSA culminated in a 44-page report released in June 2018 that analyzed a number of risks facing Buzzards Bay. AR at 1862–1905. The workshop participants reached a consensus that the risks of petroleum discharge and environmental damage "were not balanced

13

by existing mitigations." *Id.* at 1872. One of the "[m]ost commonly cited" recommendations from participants, AR at 2051, was gaining "Federal support of the Massachusetts Oil Spill Prevention Act (MOSPA) tug escort requirements" as an additional risk mitigation strategy to better balance the risks of petroleum discharge and environmental damage. AR at 1893, 1895.

46. After the PAWSA workshop, AWO wrote to the Coast Guard to express concern that the workshop "did not include a single AWO member company engaged in the transportation of oil in Buzzards Bay." AR at 2037.

47. The Coast Guard responded to AWO that "representatives from Reinauer Transportation which deals exclusively in oil transportation and McAllister Towing [an AWO member that] provides both petroleum transportation and escort tug services in Buzzards Bay were invited to participate" in the PAWSA workshop. AR at 2039.

48. The last document in the administrative record indicates that, in September 2018, the Coast Guard was following through on the PAWSA process by gathering "Post-PAWSA Waterway Information," including revising its Vessel Movement Reporting System ("VMRS") to "add data collection to capture tug assists and HAZMAT commodity flow awareness." AR at 2053. "After collecting information that resolves gaps identified in PAWSA and ensuring a complete understanding of the waterway's risk profile," the Coast Guard intends to "consider legally defensible regulatory steps to address risk in the waterway." *Id.*

**RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT**

1. As to paragraph 19, Defendant disputes that the 2007 RNA express preemption statement applied to all remaining MOSPA provisions at issue. *See* Regulated Navigation Area; Buzzards Bay; Navigable Waterways within the First Coast Guard District, 72 Fed. Reg. 50,052, 50,057 (Aug. 30, 2007).

2. As to paragraphs 29 and 48, Defendant disputes the statements of the parties' motivations as Plaintiff has not provided sufficient evidence to demonstrate those motivations.

3. As to paragraph 32, Defendant disputes that the quotation appears at the cited portion of the administrative record.

4. As to paragraphs 41 and 44, Defendant disputes the context that Plaintiff has applied to or removed from quotations. For example, the quotation "additional layers of complexity raise the difficulty of monitoring and enforcement," refers to "using any weather-related threshold conditions." AR at 1731–1732. Similarly, the quotation "would not have a beneficial impact due to the potential to put mariners at higher risk by requiring them to follow a set route when conditions warrant an alternative approach," refers to "mandating the unconditional use of recommended vessel routes." AR at 167.

5. As to paragraph 55, Defendant disputes that the "Coast Guard stated that it withdrew the motion to reopen to determine whether further regulatory action was required to comply with the First Circuit's remand," as such a statement does not appear in the corresponding citation.

6. As to paragraph 58, Defendant disputes that there was no activity responsive to the remand orders in 2015, as the last hearing before Judge Woodlock occurred in 2015.

7. As to paragraph 61, Defendant disputes that a message about additional NEPA compliance measures was communicated in June 2017, let alone for the first time in June 2017, as that claim is not supported by the cited portion of the administrative record, which is dated March 2017.

8. As to paragraph 67, Defendant disputes that the quotation refers to an intention to bring the present litigation, as the email actually refers to AWO's intention to take "independent

action to reactivate the two cases," rather than "proceeding in tandem with the U.S.," by "fil[ing] a motion in district court to restore our lawsuits," rather than a new mandamus action.  AR at 2075.

9. As to paragraph 72, Defendant disputes the accuracy of Mr. Vahey's claim, as companies in the petroleum shipping industry participated in the PAWSA workshop.  *See* AR at 2039.

10. As to paragraph 74, Defendants dispute the accuracy of the quotation.  *See* AR at 2082.

DATE: May 31, 2019          Respectfully submitted,

                                  JEAN E. WILLIAMS
                                Deputy Assistant Attorney General
                                Environment and Natural Resources Division

                                */s/ Luther L. Hajek*
                                LUTHER L. HAJEK
                                Trial Attorney, Natural Resources Section
                                United States Department of Justice
                                Environment & Natural Resources Division
                                999 18th St., South Terrace, Suite 370
                                Denver, CO 80202
                                Telephone: 303-844-1376
                                Facsimile: 303-844-1350
                                E-mail: luke.hajek@usdoj.gov

                                MICHAEL S. SAWYER
                                Trial Attorney, Natural Resources Section
                                United States Department of Justice
                                Environment & Natural Resources Division
                                601 D St. NW
                                Washington, DC 20004
                                Telephone: 202-514-5273
                                E-mail: michael.sawyer@usdoj.gov

                                ANDREW E. LELLING
                                United States Attorney

                                Michael Sady (BBO #552934)
                                Assistant U.S. Attorney
                                U.S. Attorney's Office
                                1 Courthouse Way, Suite 9200
                                Boston, MA  02210
                                (617) 748-3100
                                E-mail: Michael.Sady@usdoj.gov

                                *Counsel for Defendant*

OF COUNSEL:

Brian Judge
Heather Kennealy
United States Coast Guard

**CERTIFICATE OF SERVICE**

I hereby certify that on May 31, 2019, I filed a true and correct copy of the foregoing document with the Court's CM/ECF system, which will generate a Notice of Filing to the attorneys of record.

/s/ *Michael S. Sawyer*
MICHAEL S. SAWYER
Trial Attorney, Natural Resources Section
United States Department of Justice
Environment & Natural Resources Division
601 D St. NW
Washington, DC 20004
Telephone: 202-514-5273
E-mail: michael.sawyer@usdoj.gov